## Thomas F. Lane

*v.*

## The Rector, Wardens and Vestrymen of Calvary Church of Summit.

[Filed March 3d, 1900.]

1. The statute providing that it shall not be lawful for the rector, wardens and vestrymen of the Protestant Episcopal Church to dispose of any church real property without the previous consent of the bishop and standing committee of the diocese, the court of chancery cannot, without such consent, direct the church authorities to make a conveyance which when made is declared to be void.

2. An agreement to sell land must, in order to be binding, comprise all the terms which the parties intended to introduce into it. Upon the facts proven in this case—*Held*, that there was no concluded agreement to support a bill for specific performance.

On bill, answer and proofs.

*Mr. Frank Bergen,* for the complainant.

*Mr. Edward M. Colie,* for the defendant.

STEVENS, V. C.

This is a suit for specific performance of an alleged contract by defendant to convey to the complainant a lot of land in Summit. I think the complainant must fail, for two reasons:

*First.* It is provided by section 8 of the Religious Societies act that the trustees of such societies may convey and dispose of real estate. It is, *inter alia,* provided by section 1 of a supplement thereto, approved March 8th, 1877 (*Gen. Stat. p. 2745*), that the rector, wardens and vestrymen of Protestant Episcopal Churches shall be vested with the powers granted to trustees of religious societies generally, by the above section, with the following proviso:

" It shall not be lawful for the rector, wardens and vestrymen of any Protestant Episcopal Church ·· * * to alien, grant, assign, demise, let or mortgage any real church property without the previous written consent of the bishop and of a majority of the standing committee of the diocese within which such real church property may be situated, * * * which consent shall be acknowledged or proved and recorded with the deed, lease, mortgage or instrument of conveyance, and without such consent the alienation, grant, assignment, demise, lease or mortgage shall be void."

The land in question was the site of a church edifice which had been destroyed by fire, and was real church property within the meaning of the above enactment. The complainant did not show that the consent thereby required had been given. As its policy is to prohibit alienation, unless with the consent of the highest spiritual and temporal authority in the diocese, it is plain that the court cannot, without such consent, direct the church to make a conveyance, which, when made, is declared to be void.

*Second.* The complainant must fail, in the second place, because he does not show a concluded agreement. The facts on this branch of the case are these: The church was desirous of selling the land. One J. W. Hughes, acting as agent for Lane, the complainant, but not willing to disclose Lane's name, about April 15th or 16th, 1899, told Mr. Cady, one of the vestrymen, that he had a party who would agree to give $15,000. A vestry meeting was thereupon called, and it was, in the language of the

Lane v. Calvary Church of Summit.

minutes, proposed by Mr. Bulkley and carried, "that the offer of $15,000, in cash or its equivalent, made by J. W. Hughes for the old church site, be unanimously accepted."

The matter was referred to the finance committee, of which Mr. Truslow was chairman. Mr. Bulkley, the proposer of the resolution, testifies:

"The record of the resolution of the vestry was not exactly in the form as recorded in the minutes; it was in the form of willingness to sell the property for that money and to accept the offer, and the matter was referred to the finance committee to carry out the negotiations; Mr. Truslow, as the chairman, acted as their agent in the matter; it was in his hands."

That this is a substantially correct version of the action taken appears from the letter of Mr. Truslow, written the following day. It reads as follows:

"NEW YORK, April 18, 1899.

"*Mr. John W. Hughes:*

"DEAR SIR—I beg to advise you that our finance committee, authorized by a resolution of the vestry, hereby accept your offer, on behalf of your principal not yet named, for the property now owned by Calvary Church in Summit, and bounded by Springfield avenue, Keithock place and Bank street, the price to be $15,000, cash or its equivalent. The above confirms our conversation of this morning, and I have wired you since, asking you to meet Mr. Wisner and me at the Summit station this afternoon, at six o'clock (on arrival of the five o'clock train from New York, *to arrange the details of sale.*

"Yours truly,

"J. L. TRUSLOW, JR.,

"*Chairman.*"

The details alluded to in this letter as shown by the subsequent negotiations were principally three:

*First.* There was a mortgage of $10,000 on the property, and the question was whether the property should be conveyed subject to the mortgage or whether it should be paid off. It was agreed by word of mouth that the whole $15,000 should be paid in cash and the mortgage paid thereout and canceled.

*Second.* There was a sewer assessment on the property, and the second question was whether it should be paid by the purchaser or by the seller. After some discussion it was agreed by word of mouth that it should be paid by the purchaser.

*Third.* Within a day or two after the letter was written, two drafts of an agreement to convey were prepared, one under the direction of Mr. Hughes, on behalf of Mr. Lane, and another by Mr. Crawford, on behalf of the church. They differ considerably in form, but they agree in this: the church was stated to be the party of the first part, and John W. Hughes was stated to be the party of the second part. Immediately after their preparation Hughes met the committee. The respective drafts were compared and the terms of the agreement to be executed were settled. Among the terms was one that Hughes should pay $250 in cash at the time of execution. Hughes did not execute it then, because he said he did not have the money with him. The officers of the church, however, signed and sealed the contract that evening. On the following morning Hughes and Crawford met again; Hughes produced a check, and taking a pen in his hands said that he wanted it understood, before he signed, that he was not to be liable for more than $250, in case his principal failed to carry out the agreement. Crawford declined to agree to this and the parties left the office, Crawford going to the train. On the sidewalk Mr. Wisner, one of the committee, met them. The difficulty was stated to him and he, too, told Hughes that he was without authority to agree to the modification. They then parted. There was no subsequent meeting and the officers of the church very shortly after (April 20th) entered into an agreement to sell to one Schultz. The present suit was commenced on April 27th.

The claim of Lane is that the agreement was concluded either when the resolution was passed or when the Truslow letter was mailed. Neither of these contentions appears to me to be sound. "An agreement," says Lord Wensleydale, in *Ridgway* v. *Wharton, 6 H. L. Cas. 268,* " to be finally settled must comprise all the terms which the parties intended to introduce into the agreement. An agreement to enter into an agreement upon terms to be afterwards settled between the parties is a contradiction in terms." Here it is obvious, from what subsequently took place, that neither the resolution nor the letter comprised and finally settled all the terms. The resolution of the vestry

Lane v. Calvary Church of Summit.

did indeed name the price, but then it left it open to its committee to settle the other terms. Truslow's letter, while accepting the price offered, asks for a meeting to arrange "the details," and when this meeting takes place it is at once seen that these details comprise matters of such importance as the payment of the sewer assessment, the disposition of the mortgage and the question who shall be bound as vendee.

The case in this respect strongly resembles *Brown* v. *New York Central Railroad Co., 44 N. Y. 80,* in which the letter mentioning the price stated that " other details would require consideration." The court, looking at the subsequent negotiations for the purpose of ascertaining what these details were, said that they constituted essential elements of the contract not implied by or to be inferred from what the parties had agreed upon, but left open for future consideration and adjustment, and that such being the case, the contract lacked completeness and no action could arise upon it. In the case at bar the " details " likewise constituted important elements of the contract and could not be implied by or inferred from either the resolution or the letter, for of the two liens on the property it was agreed that one should be satisfied out of the price coming to the vendor and that the other should be paid by the vendee. Certainly this was an adjustment which no court would have deduced from what had been written.

It is also plain that one of the terms of the agreement, actually made by word of mouth, was that Hughes should sign a written agreement. This was a matter of unusual importance because of his unwillingness to disclose his principal. He subsequently refused to sign, not wanting, on further reflection, to be bound beyond $250. In the case already cited, Lord Wensleydale says: " If the understanding between the parties is that they are to reduce the agreement into writing, and that they are not to be bound until it is reduced into writing, then either party may withdraw " (before it is signed). Mr. Hughes, at the last moment, took advantage of this right to withdraw, and so the only paper which expressed all the terms of the agreement, concluded by word of mouth, never became operative because not signed by him.